UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | | |
|---|---|---|
| UNITED STATES, | | No. C 11-06605 LB |
| | Plaintiff, | **ORDER DENYING CLAIMANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | | |
| $127,000 IN U.S. CURRENCY, | | |
| | Defendant. | |
| _____/ | | [Re: ECF Nos. 15, 34] |

## I. INTRODUCTION

On July 31, 2011, task force officers with the Drug Enforcement Administration ("DEA") seized $127,000 in United States currency from claimant Angelo Salazar after he arrived at San Francisco International Airport ("SFO"). Believing there to be probable cause that the seized currency is related to drug trafficking, on December 22, 2011, the United States (the "Government") instituted civil forfeiture proceedings in this court. Now, at this relatively early stage of the litigation, Mr. Salazar and the Government both move for summary judgment on the issue of whether probable cause existed to support the warrantless seizure of Mr. Salazar's property and allow the Government to institute this civil forfeiture proceeding. Upon consideration of the papers submitted and applicable legal authority, and the arguments of counsel at the hearing on June 21, 2012, the court **DENIES** Mr. Salazar's motion for summary judgment and **GRANTS** the Government's motion for summary judgment.

///

C 11-06605 LB
ORDER

## II. BACKGROUND

A. Undisputed Facts[1]

On July 31, 2011, Mr. Salazar, who has never been arrested for any drug or drug-related offense, boarded United Airlines Flight #857 in Midland, Texas and traveled to San Francisco, California. Complaint, ECF No. 1 at 2, ¶¶ 9, 12.[2] He used his credit card to purchase his $500 one-way ticket through Orbitz.com. *Id*. at 2, ¶ 9. He traveled with only a single duffel bag, which he carried onto the flight. *Id*. at 2, ¶¶ 9, 12.

Upon arriving at SFO, Mr. Salazar was met by DEA Task Force Agents ("TFA") Kevin O'Malley and Martin Mahon. *Id*. at 2-3, ¶ 11. TFA Mahon explained to Mr. Salazar that he was not under arrest and was free to leave at any time, and Mr. Salazar understood. *Id*. The agents stood to the sides of Mr. Salazar at a conversational distance, did not block his path of travel, and spoke in calm, normal voices. *Id*. at 3, ¶ 11.

Mr. Salazar identified himself to TFA O'Malley and TFA Mahon by showing them his New Mexico driver's license, although he also stated that he currently lived in Texas but did not have a Texas driver's license. *Id*. at 3, ¶ 12. TFA Mahon asked Mr. Salazar if he was carrying a large amount of United States currency. *Id*. Mr. Salazar admitted that he was and said that it was in his duffel bag. *Id*. TFA Mahon asked Mr. Salazar if the agents could search his duffel bag, and Mr. Salazar consented. *Id*. Without being asked, Mr. Salazar voluntarily unlocked the lock on the end pocket of his duffel bag and removed a small brown leather bag from his duffel bag. *Id*. Mr. Salazar then opened that the small brown leather bag. *Id*. It contained several bundles of rubber-banded United States currency. *Id*. The currency consisted of 1,190 $100 bills, 87 $50 bills, 154 $20 bills, 56 $10 bills, and 2 $5 bills and totaled $127,000. *Id*. TFA O'Malley searched the remainder of Mr.

---

[1] All of the facts stated below either were admitted by Mr. Salazar in his answer or were confirmed by the parties as being not reasonably in dispute. *See* Answer, ECF No. 9; Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26.

[2] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document, not the pages at the bottom.

C 11-06605 LB
ORDER
2

Salazar's duffel bag but did not find any additional currency or any contraband. *Id.*

Mr. Salazar told the agents that the currency was for the purchase of used oil drill bits that he was going to use himself. *Id.* at 3-4, ¶¶ 13-14.[3] He said that he was self-employed, but he also said that he worked for Rojo Supply Company. *Id.* at 4, ¶ 14.[4] Mr. Salazar stated that he was traveling to San Luis Obispo, California to purchase used oil drill bits from oil companies, but he did not provide the agents with any contact information for the suppliers of these drill bits. *Id.* at 3, ¶ 13. He also told the agents that he planned to rent a pick-up truck and drive the used oil drill bits to Texas in it. *Id.*; Angelo Salazar Declaration, ECF No. 16 at 3, ¶ 9.

This was not the first time Mr. Salazar had done this. He told TFA O'Malley and TFA Mahon that he had traveled to the San Francisco area on prior occasions in 2011. Complaint, ECF No. 1 at 4, ¶ 15. On one occasion, he drove with an unidentified friend and carried $40,000 with him. *Id.* He purchased used oil drill bits and drove back to Texas with them. *Id.* On another occasion, he flew into SFO with $70,000 to purchase oil drill bits in San Luis Obispo and then drove back to Texas with them. *Id.*[5] When asked about the source of the $127,000, Mr. Salazar said that he had

---

[3] The court notes that parties' joint statement of undisputed facts states that Mr. Salazar told the agents that he currency was for the purchase of used "oil drill bits" and cites Paragraph 13 of the Government's complaint and Paragraph 7 of Mr. Salazar's declaration in support of his motion for summary judgment. Joint Statement of Undisputed Facts, ECF No. 19 at 3, ¶ 15. The complaint does in fact allege that Mr. Salazar told the agents that the currency was for the purchase of "oil drill bits," but Mr. Salazar's declaration states that it was for the purchase of used "tricone oil drill bits." *Compare* Complaint, ECF No. 1 at 3, ¶ 13 *with* Angelo Salazar Declaration, ECF No. 16 at 2-3, ¶ 7. Just to be clear, the parties dispute whether Mr. Salazar told the agents that the currency for the purchase of tricone oil drill bits.

[4] The court notes that the parties dispute whether Mr. Salazar told the agents that Rojo Supply Company was in Texas. *Compare* Complaint, ECF No. 1 at 4, ¶ 14 *with* Answer, ECF No. 9 at 3, ¶ 14.

[5] The court notes that the parties' joint statement of undisputed facts states that Mr. Salazar told the agents that he purchased drill bits in San Luis Obispo, California during his second trip to California in 2011 and cites Paragraph 15 of the Government's complaint. Joint Statement of Undisputed Facts, ECF No. 19 at 4, ¶ 19. The Government's complaint, however, alleges that Mr. Salazar told the agents that he purchased drill bits in Santa Barbara, California. Complaint, ECF No. 1 at 4, ¶ 15. Although the cities of Santa Barbara and San Luis Obispo are relatively close to each other, they are not the same, and the court notes this discrepancy.

recently won a horse race and received $50,000. *Id.* at 4, ¶ 16.[6]

TFA O'Malley and TFA Mahon then seized the $127,000 from Mr. Salazar, and TFA Mahon placed it in a self-sealing evidence bag. *Id.* at 4, ¶ 17.[7] TFA McMahon provided Mr. Salazar with a United States Department of Justice - Drug Enforcement Administration Receipt for Cash or Other Items for the seized United States currency. *Id.*

TFA Mahon took the money to the baggage carousel area and placed it underneath a luggage tub along with several other pieces of luggage. *Id.* at 4, ¶ 18.[8] TFA Mahon then brought his narcotics detection canine, Dugan, who is certified to detect heroin, cocaine, marijuana, hashish, and methamphetamine, to conduct a search. *Id.* According to TFA Mahon, Dugan's behavior indicated that the odor of narcotics was emanating from the $127,000 that the agents seized from Mr. Salazar. *Id.* In common legal parlance, Dugan "positively alerted" to the seized currency.

The $127,000 in United States currency that was seized from Mr. Salazar was later counted at a bank and converted to a cashier's check make payable to the United States Marshal's Service. *Id.* at 5, ¶ 19.

B.  Disputed Facts

In addition to the above undisputed facts, the Government makes several other allegations,

---

[6] Mr. Salazar now apparently admits that he won only $21,000 from a horse race. *See* Government's Opposition and Cross-Motion for Summary Judgment, ECF No. 34 at 22 n.3; Kinney Declaration, ECF No. 28 at 2, ¶ 2, Ex. K.

[7] Although the parties' statement of undisputed facts does not explicitly state that the agents seized the $127,000 from Mr. Salazar, it implicitly supports this fact. *See* Joint Statement of Undisputed Facts, ECF No. 19 at 3, ¶ 12 ("Following its seizure, the currency . . . .").

[8] With respect to the dog alert, the parties' joint statement of undisputed facts states that the parties agree that "[t]he Complaint alleges" that TFA Mahan placed the money under a luggage tub, that Dugan positively alerted to it, and that Dugan is certified to detect heroin, cocaine, marijuana, hashish, and methamphetamine. *See* Joint Statement of Undisputed Facts, ECF No. 19 at 3-4, ¶¶ 34-36. But based on Mr. Salazar's papers, the parties' supplemental joint statement of undisputed facts, and the arguments of his counsel at the hearing on June 21, 2012, it appears that Ms. Salazar disputes only whether Dugan is a "sophisticated" narcotics detection canine (which goes to the weight to be afforded to Dugan's positive alert) and whether his positive alert has probative value. *See* Salazar's Motion for Summary Judgment, ECF No. 15 at 10 & n.5, 22-25; Supplemental Joint Statement of Undisputed Facts, ECF No. 26 at 2, ¶¶ 38-40; Reply, ECF No. 40 at 9-14.

which Mr. Salazar appears to contest. These include the following allegations:

1. Mr. Salazar traveled to Amsterdam in November 2008 and attended a hemp festival. *Compare* Complaint, ECF No. 1 at 2, ¶ 10 *with* Answer, ECF No. 9 at 2, ¶ 10 ("Claimant admits that he traveled to and through Amsterdam in 2008, but denies that he attended a hemp festival."); *see generally* Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26.

2. When searching Mr. Salazar's duffel bag, TFA O'Malley noticed that Mr. Salazar only packed a limited amount of clothing, including only three shirts. *See* Joint Statement of Undisputed Facts, ECF No. 19 at 3, ¶ 14 (the parties agree that "[t]he complaint alleges that Mr. Salazar had limited clothing in his duffel bag, including three shirts").

3. Mr. Salazar was not able to logically and fully explain why he purportedly purchased used oil drill bits with cash, rather than through other, more conventional means, or why he did not receive receipts for these purchases. *Compare* Complaint, ECF No. 1 at 3, ¶ 13 *with* Answer, ECF No. 3, ¶ 13; *see generally* Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26.

4. When asked about the source of the $127,000, the parties agree that Mr. Salazar said that he had recently won a horse race and received $50,000, but the parties dispute whether Mr. Salazar could not explain how he obtained the remainder of the money. *Compare* Complaint, ECF No. 1 at 4, ¶ 16 *with* Answer, ECF No. 9 at 3, ¶ 16; *see generally* Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26.

5. Mr. Salazar disputes the Government's contention that Dugan is a "sophisticated" narcotics detection canine. Supplemental Joint Statement of Undisputed Facts, ECF No. 26 at 2, ¶ 39; *see* Mahon Declaration, ECF No. 31 at 4, ¶ 7.

6. San Francisco is a "source city" for the purchase of illegal controlled substances, including marijuana. *Compare* Complaint, ECF No. 1 at 6, ¶ 20 *with* Answer, ECF No. 9 at 4, ¶ 20; *see generally* Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26.

C. Procedural Background

On December 22, 2011, after giving Mr. Salazar proper notice, the Government instituted civil forfeiture proceedings with respect to the $127,000 seized from Mr. Salazar. Complaint, ECF No. 1 at 2, ¶¶ 5-6; Answer, ECF No. 9 at 2, ¶¶ 5-6. On January 25, 2012, Mr. Salazar asserted a claim to the seized $127,000 and demanded a jury trial. Verified Claim and Statement of Interest, ECF No. 5. On February 14, 2012, Mr. Salazar filed an answer to the Government's complaint. Answer, ECF No. 9.

Mr. Salazar now moves for summary judgment on the ground that the Government lacked probable cause to institute the civil forfeiture proceedings. Salazar's Motion for Summary Judgment, ECF No. 15. The Government opposes Mr. Salazar's motion, and it cross-moves for summary judgment on the ground that it did have probable cause to initiate these proceedings. Government's Opposition and Cross-Motion for Summary Judgment, ECF No. 34. Mr. Salazar opposes the Government's motion. Salazar's Opposition and Reply, ECF No. 40. The court heard oral argument from the parties on June 21, 2012.

### III.  LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosures on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id.* at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See id.* at 248-49.

The party moving for summary judgment has the initial burden of identifying those portions of the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party has the burden of proof at trial, the moving party need point out only "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets this initial burden, the non-moving party must go beyond the pleadings and – by its own affidavits or discovery – set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986).  If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477 U.S. at 323.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

Summary judgment is not only proper if a party fails to produce *any* evidence on an element of his or her case, but summary judgment is also proper if a party fails to produce *sufficient* evidence on an element of his or her case.  The Supreme Court has specifically held that summary judgment is proper against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The mere existence of a "scintilla" of evidence in support of the non-moving party's position is not sufficient.  The non-moving party has the burden of establishing sufficient evidence on each element of his case so that the finder of fact could return a verdict for him.  *Anderson*, 477 U.S. at 249.   To meet this burden, the nonmoving party must come forward with admissible evidence.  Fed. R. Civ. P.56(e).  Conclusory or speculative testimony in affidavits and moving papers is not sufficient to defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Moreover, the court should "refuse[]to find a 'genuine issue'" where the only evidence presented is "uncorroborated and self-serving testimony." *Villarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).

**IV.  DISCUSSION**

A.  Mr. Salazar's Request for Judicial Notice and the Government's Evidentiary Objections

1.  Mr. Salazar's Request for Judicial Notice

In a request accompanying his motion for summary judgment, Mr. Salazar asks the court to take judicial notice of the following: (1) certified copies of (a) the Office of the Public Regulation Commission of New Mexico's Certificate of Organization of Rojo Supply, LLC, (b) Articles of Organization for Rojo Supply, LLC, and (c) the Statement of Acceptance of Appointment of Designated Initial Registered Agent for Rojo Supply, LLC; (2) a map indicating the Hobbs, New

Mexico is located approximately 5 miles from the border of New Mexico and Texas; (3) a screenshot of the webpage of Torquato Drilling Accessories, Inc. ("Torquato Drilling") that states that tricone drill bits "are offered only on a cash basis"; and (4) various charts, documents, and maps from the California Department of Conservation that show the extent of oil and gas production activities in San Luis Obispo and Santa Barbara counties. Salazar's Request for Judicial Notice ("RJN"), ECF No. 20 at 2-3, Exs. 1-4. The government makes several objections to Mr. Salazar's request. Government's Objections to RJN, ECF No. 27.

Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A "high degree of indisputability is the essential prerequisite" to taking judicial notice and "the tradition [of taking judicial notice] has been one of caution in requiring that the matter be beyond reasonable controversy." Fed. R. Evid. 201(a) & (b) advisory committee's notes (emphasis added). A court, then, may take judicial notice of undisputed facts contained in public records, but it may not take judicial notice of disputed ones. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); *see also Muhammad v. California*, C-10-1449-SBA, 2011 WL 873151, at *4 (N.D. Cal. Mar. 11, 2011) (denying request for judicial notice of an address contained on a complaint filed in another case because the "underlying facts relevant to Plaintiff's residence are disputed and otherwise do not meet the requirements of Rule 201").

With respect to the documents related to Rojo Supply, LLC, while the Government does not object to the court taking judicial notice of the documents themselves, it argues that the documents, all of which were filed on December 2, 2009, are not evidence of the company's current existence. Government's Objections to RJN, ECF No. 27 at 4, ¶ 2. Fair enough, but Mr. Salazar does not ask the court to take judicial notice of current existence of Rojo Supply, LLC (if indeed it does currently exist). Rather, he only asks the court to take judicial notice of the existence of the documents he submitted. Because the documents he submitted are public records, the court takes judicial notice of them. *See Lee*, 250 F.3d at 689-90.

With respect to the map indicating that Hobbs, New Mexico is only about 5 miles from the border of New Mexico and Texas, while the Government does not object to the court taking judicial notice of a map generally, it argues that Mr. Salazar has not shown that it is relevant or material to this action and thus is inadmissible as evidence. Government's Objection to RJN, ECF No. 27 at 4, ¶ 3. Mr. Salazar contends that the map is relevant to corroborating his explanation about where he lived and worked. Salazar's RJN Reply, ECF No. 43 at 2-3. Mr. Salazar has made a sufficient showing of relevance, and, because the location of Hobbs, New Mexico, and its distance to the border of New Mexico and Texas can be accurately and readily determined from a source whose accuracy cannot reasonably be questioned, namely, the map, the court takes judicial notice of it. See *Hays v. National Elec. Contractors Ass'n*, 781 F.2d 1321, 1323 (9th Cir. 1985) (taking judicial notice of a map to show counties included in a forty mile radius).

With respect to the screenshot of the Torquato Drilling's webpage, the Government objects to the court taking judicial notice of the "facts" found on it. Government's Objection to RJN, ECF No. 27 at 2-, ¶ 1. As the Government readily admits, Mr. Salazar's request for judicial notice appears to ask the court to take judicial notice of it "to 'indicate what was in public realm at the time, not whether the contents of those articles were in fact true.'" RJN, ECF No. ECF No. 20 at 3 (citing *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)). The Government argues, however, that Mr. Salazar "takes a more expansive view" in his motion for summary judgment, in which he argues that the court should accept the content of webpage (i.e., that Torquato Drilling in fact offers tricone drill bits only "on a cash basis"). Perhaps Mr. Salazar is taking this expansive view in his brief, but he has not asked the court for judicial notice in that regard. Instead, he has only asked the court to take judicial notice of the webpage's existence, and that is all the court will do. In so doing, though, the court makes clear that it only takes judicial notice that the webpage of Torquato Drilling, on December 19, 2011, stated that tricone drill bits

1 "are offered only on a cash basis. *See Von Saher*, 592 F.3d at 960.[9]

2     Finally, with respect to the various charts, documents, and maps that show the extent of oil and
3 gas production activities in San Luis Obispo and Santa Barbara counties, the Government objects
4 because it says that Mr. Salazar has not established a foundation for their authenticity (it notes that
5 some of the documents do not identify themselves as coming from the California Department of
6 Conservation) and because he has not shown them to be relevant or material to this action.
7 Government Objection to RJN, ECF No. 27 at 4-5, ¶ 4. Even though public documents are self-
8 authenticating and a few of them contain the words "California Department of Conservation," Mr.
9 Salazar submitted, in response to the Government's objection, a declaration attesting that the
10 submitted documents were printed from the website for the California Department of Conservation.
11 *See* Riley RJN Declaration, ECF No. 43-1. This is sufficient to authenticate them. As for the
12 Government's relevance and materiality arguments, Mr. Salazar argues that the various charts,
13 documents, and maps are relevant to corroborating his explanation about where he purchased used
14 oil drill bits. Salazar's RJN Reply, ECF No. 43 at 2-3. This is a sufficient showing of relevance and
15 materiality. The court therefore takes judicial notice of the various charts, documents, and maps
16 from the California Department of Conservation that Mr. Salazar submitted. *See Lee*, 250 F.3d at
17 689-90; *Hays*, 781 F.2d at 1323.

18     <u>2. The Government's Objection to Article Cited in Mr. Salazar's Opposition and Reply</u>

19     The Government objects to an article cited by Mr. Salazar in his opposition to the Government's
20 cross-motion for summary judgment. Government's Objection to Article, ECF No. 48; *see* Salazar's
21 Opposition and Reply, ECF No. 40 at 12-13. Specifically, the Government objects to the following
22 statement and citation: "[Dog alerts] continue to be a subject area in which experts have expressed
23 profound skepticism. *See* Lit, Schweitzer & Oberbauer, *Handler Beliefs Affect Scent Detection Dog*
24 *Outcomes*, Anim. Cogn. (May 2011) (published study explaining that handlers' beliefs affect
25 outcomes of scent detection dog deployments)." Salazar's Opposition and Reply, ECF No. 40 at

---

[9] The court notes that the screenshot submitted was taken on December 19, 2011. *See* RJN, ECF No. 20, Ex. 3.

1  12-13.  In addition to attacking the article's relevance, the Government argues that Mr. Salazar

2  offers it as "expert opinion testimony" without having "established the authors as experts in a

3  specific

4  field who employed a valid and reliable methodology to reach valid results which have been

5  subjected to peer review and which could apply to this case," as required by Federal Rule of

6  Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  Government's

7  Objection to Article, ECF No. 48 at 2; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147,

8  149 (citing *Daubert*, 509 U.S. at 592).

9  While it is unclear whether Mr. Salazar truly intended to offer the article at issue as "expert

10  opinion testimony" as the Government suggests, it is true that Mr. Salazar did not establish the

11  article's authors as experts.  For that reason, the court does not consider the above quoted sentence

12  and citation from Mr. Salazar's opposition and reply.

13  B.  The Parties' Motions for Summary Judgment

14  This case is governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No.

15  106-185, 114 Stat. 202 (2000).  Prior to CAFRA's passage, under 19 U.S.C. § 1615, at trial, the

16  Government had "the initial burden of establishing probable cause connecting seized property with

17  illegal drug transactions."  The burden then shifted to claimants to prove, by a preponderance of the

18  evidence, that the money was not connected with illegal drug activity.  *See United States v. $42,500*

19  *in U.S. Currency*, 283 F.3d 977, 980 (9th Cir. 2002).  Congress passed CAFRA to "transfer[ ] the

20  burden of proof to the government and required[ ] the government to establish forfeiture by a

21  preponderance of the evidence rather than by the [former] lower probable cause standard."  *United*

22  *States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002).  When the "the

23  Government's theory of forfeiture is that the property was used to commit or facilitate the

24  commission of a criminal offense, or was involved in the commission of a criminal offense, the

25  Government shall establish that there was a substantial connection between the property and the

26  offense."  18 U.S.C. § 983(c)(3).  The burden then shifts to the claimant to prove by a preponderance

27  of the evidence that the claimant is an innocent owner of the property.  18 U.S.C. § 983(d).  The

28  determination of whether the Government has met its burden of proof is based on the aggregate of

facts, including circumstantial facts. *$42,500 in U.S. Currency*, 283 F.3d at 980; *see also United States v. $30,060 in U.S. Currency*, 39 F.3d 1039, 1041 (9th Cir. 1994).

In his summary judgment motion, Mr. Salazar argues that the Government lacked probable cause to even institute the instant civil forfeiture proceedings. The Government may institute civil forfeiture proceedings if it can demonstrate probable cause for doing so. 19 U.S.C. § 1615; *see United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 948-49 (9th Cir. 2010) ("Pursuant to 19 U.S.C. § 1615, which also assigns the burden of proof in forfeiture proceedings, the government must show that probable cause exists to initiate its action."); *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) ( ("We hold that section 1615 continues to require that the government show probable cause to institute a forfeiture action."); *see also United States v. Thirteen Thousand Three Hundred Ninety-One and No/100 ($13,391.00) in United States Currency*, CV No. 07-00339 DAE-BMK (D. Haw. Apr. 14, 2010) ("In examining whether the government's burden of proof *at trial* under CAFRA replaces, rather than merely adds to, the probable cause requirement to *institute* a forfeiture proceeding, the Ninth Circuit held that the CAFRA requirement describes the government's burden at trial while the probable cause requirement of 19 U.S.C. § 1605 describes the government's burden to get in the courthouse door.") (emphasis in original) (citing *$493,850.00 in U.S. Currency*, 518 F.3d at 1167-69).[10]

"The government has probable cause to institute a forfeiture action when it has reasonable grounds to believe that the property was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion." *$493,850.00 in U.S. Currency*, 518 F.3d at 1169 (internal quotation marks omitted). "Probable cause to believe that the property is involved in some illegal activity is not enough—the government must have probable cause to believe that the property

---

[10] In its cross-motion for summary judgment and opposition to Ms. Salazar's motion for summary judgment, the Government suggests that the court should follow a First Circuit opinion, *United States v. Lopez-Burgos*, 435 F.3d 1 (1st Cir. 2006), that concluded that CAFRA eliminated the requirement that probable cause exist at the time the civil forfeiture complaint is filed. *See* Government's Opposition and Cross-Motion for Summary Judgment, ECF No. 34 at 15-17. The government plaintiff-appellee made the same argument to the Ninth Circuit panel in *$493,850 in U.S. Currency*, but the panel rejected it. 518 F.3d at 1167-69. For this reason, this court rejects it as well.

C 11-06605 LB
ORDER
12

1 is involved in the activity subject to the specific forfeiture statute it invokes." *Id.*

2 The determination of probable cause for forfeiture "is based upon a 'totality of the
3 circumstances' or 'aggregate of facts' test." *United States v. Approximately $1.67 Million (US) in*
4 *Cash, etc.*, 513 F.3d 991, 999 (9th Cir. 2008) (quoting *United States v. $129,727.00 U.S. Currency*,
5 129 F.3d 486, 489 (9th Cir. 1997) (internal quotation marks and citations omitted). "Each case
6 stands upon its own facts, and the presence or absence of any one fact is not dispositive; indeed
7 probable cause is not an exacting standard." *United States v. $42,500 in U.S. Currency*, 283 F.3d
8 977, 980 (9th Cir. 2002). "Circumstantial evidence may suffice to establish probable cause for
9 forfeiture." *United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1041 (9th Cir. 1994) (citing
10 *United States v.1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir. 1988)). "The
11 Government may establish probable cause by relying on 'otherwise inadmissible hearsay' because
12 '[t]he question of probable cause depends not upon the admissibility of the evidence upon which the
13 government relies but only upon the legal sufficiency and reliability of the evidence.'" *United*
14 *States v. $405,089.23 U.S. Currency*, 122 F.3d 1285, 1289 (9th Cir. 1997) (quoting *United States v.*
15 *One 56-Foot Motor Yacht Named the Tahuna*, 702 F.2d 1276, 1283 (9th Cir. 1983)). But the
16 probable cause determination may be based only upon information gathered before the forfeiture
17 action was instituted. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169 (citing *United States v.*
18 *$191,910 in U.S. Currency*, 16 F.3d 1051, 1071 (9th Cir. 1994), *superceded in part by statute*,
19 CAFRA, Pub.L. No. 106–185, *as recognized by United States v. $80,180.00 in U.S. Currency*, 303
20 F.3d 1182, 1184 (9th Cir. 2002)).[11]

21 The court must therefore determine whether the Government had probable cause, when it filed
22 its complaint on December 22, 2011, to believe that the seized $127,000 in United States currency
23 represented drug proceeds or was used or intended to be used in a drug transaction. According to the
24 Government, probable cause is supported by the following: "(1) the manner of [Mr.] Salazar's
25 travel, including the one-way airline ticket; (2) the substantial amount of United States currency

---

[11] In contrast, at trial, in order to establish, by a preponderance of the evidence, that the property is subject to forfeiture, the Government may rely upon evidence gathered after the filing of the complaint.

[that] [Mr.] Salazar had with him; (3) the manner in which defendant $127,000 in various denominations was secured in bundles that were rubber-banded; (4) the inability of [Mr.] Salazar to be able to explain why he used cash to purchase oil drilling bits and why he did not obtain documentation when purchasing drilling bits; (5) the lack of verification of the company for which [Mr.] Salazar claimed to work; (6) [Mr.] Salazar's claim that he lived and worked in Texas in a job which required driving long distances, but he had no Texas driver's license; (7) [Mr.] Salazar's claim that the source of $50,000 was from a recently won horse race and his inability to explain the source of the remaining $77,000; (8) the limited clothing [Mr] Salazar brought on the trip; (9) the positive alert to defendant $127,000 of Dugan, a trained and certified narcotics detection canine; (10) [Mr.] Salazar's admission that he made repeated trips to San Francisco International Airport – albeit Los Angeles International Airport [is] closer both to Midland and to San Lius Obispo – during which [] he brought in increasingly greater amounts of cash[,] which reflects that his business was expanding; (11) the fact that drug trafficking is a cash-based business, rather than one relying on credit cards or other legitimate forms of payment [that] are documented and could be traced back to the drug trafficker; (12) the fact that drug traffickers must devise methods for transferring cash, such as carrying it on airlines, [that] avoid use of financial institutions because those institutions are subject to currency reporting requirements for amounts exceeding $10,000 and Currency Transaction Reports, if executed, [that] could lead to the identification of drug traffickers and trace their drug trafficking activities; and (13) San Francisco is a source city for the purchase of illegal controlled substances, including marijuana." Complaint, ECF No. 1 at 5-6, ¶ 20.

Some of these facts are disputed by Mr. Salazar, and so the court cannot rely upon them for purposes of granting a motion for summary judgment. For instance, the Government contends that Mr. Salazar was not able to logically and fully explain how he acquired all of the $127,000 that he had in his duffel bag, why he purportedly purchased used oil drill bits with cash, rather than through other, more conventional means, or why he did not receive receipts for these purchases. It also contends that he could not provide any contact information for any suppliers of these drill bits. Mr. Salazar contests this characterization of his conversation with TFA O'Malley and TFA Mahon, although he does concede that he "did not" (as opposed to "could not") provide them with any

contact information for any drill bit suppliers. *See* Joint Statement of Undisputed Facts, ECF No. 19 at 3, ¶ 16

Mr. Salazar also challenges the Government's reliance on his travel to San Francisco. The Government alleges that San Francisco is a "source city for the purchase of illegal controlled substances," but Mr. Salazar appears to contest this point. *Compare* Complaint, ECF No. 1 at 6, ¶ 20 *with* Answer, ECF No. 9 at 4, ¶ 20; *see generally* Joint Statement of Undisputed Facts, ECF No. 19; Supplemental Joint Statement of Undisputed Facts, ECF No. 26. If San Francisco's status as a "source city" were uncontested, however, it would, in light of the other facts, be probative evidence of drug trafficking. *See United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001) (noting that Phoenix is a known source city for drugs and finding that it is probative of probable cause in light of other facts to suggest that claimant was a drug courier); *$215,300*, 882 F.2d 417, 419 (11th Cir. 1989) (finding claimant's Miami destination, a "well know center of illegal drug activity," was probative of probable cause when combined with other circumstances).

Nevertheless, a sufficient number of undisputed material facts, considered in the aggregate, support the conclusion that probable cause existed at the time the Government filed its complaint. Mr. Salazar argues otherwise, but the court is not persuaded.[12] First, Mr. Salazar argues that the

---

[12] Mr. Salazar also argues that his lack of a drug or drug-related arrest or conviction supports a lack of probable cause. It is true that past drug convictions, arrests, and drug-related forfeitures are probative evidence of probable cause, *see $22,474.00 in U.S. Currency*, 246 F.3d at 1217 (citing *$83,310.78*, 851 F.2d at 1236), but the Government is not relying upon a prior drug or drug-related arrest in this case. The government instead appears to be relying on Mr. Salazar's alleged attendance at a hemp festival in Amsterdam in November 2008. (This contested fact, even if true, does not appear to have any probative value. *Cf. United States v. $32,000 in U.S. Currency*, No. CV06-1766-PHX-DGC, 2007 WL 1297098, at *4 (D. Ariz. Apr. 30, 2007).) Mr. Salazar also argues that his purchase of a one-way ticket does not support probable cause, and the court agrees. While cash purchases of one-way tickets for travel to known source cities for drugs have been found to support probable cause for seizure, *see$22,474.00 in U.S. Currency*, 246 F.3d at 1216, Mr. Salazar used his credit card to purchase his ticket through Orbitz.com. Complaint, ECF No. 1 at 2, ¶ 9; Joint Statement of Undisputed Facts, ECF No. 19 at 2, ¶ 2. *Cf. United States v. A) $58,920.00 in U.S. Currency, B) $38,670.00 in U.S. Currency*, 385 F. Supp. 2d 144, 152 (D.P.R. 2005) (finding that a purchase of a one-way ticket with cash to support a finding of probable cause and noting that "drug couriers," unlike "business travelers," "do not often purchase airline tickets with credit cards or checks").

C 11-06605 LB
ORDER
15

1 undisputed fact that he was carrying $127,000 in cash does not support probable cause. Salazar's
2 Motion for Summary Judgment, ECF No. 15 at 14-15. In the Ninth Circuit, while a large amount of
3 cash, on its own, does not establish probable cause, *$405,089.23 U.S. Currency*, 122 F.3d at 1291, it
4 can be considered "'in combination with other persuasive circumstantial evidence,'" *id*. (quoting
5 *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989)), and may be "strong evidence that the
6 money was furnished or intended to be furnished in return for drugs," *United States v. $29,959.00 in*
7 *U.S. Currency*, 931 F.2d 549, 553 (9th Cir. 1991) (finding cash amounting to $29,959.99 is an
8 "extremely large amount" to be kept in the home). *See Currency, U.S. $42,500.00*, 283 F.3d at
9 981-82 (noting that a large amount of cash is strong evidence that the money was furnished or
10 intended to be furnished in return for drugs; however, possession of a large sum of money standing
11 alone is insufficient to establish probable cause). There is no doubt that $127,000 is an extremely
12 large amount of money to carry on one's person; it is much more than other instances which the
13 Ninth Circuit found to be "strong evidence" of a connection to drugs. *See $29,959.00 in U.S.*
14 *Currency*, 931 F.2d at 553; *Currency, U.S. $42,500.00*, 283 F.3d at 981-82. Although not
15 dispositive, that Mr. Salazar was carrying $127,000 in cash is "strong evidence" that it was
16 furnished or intended to be furnished in return for drugs. *See $29,959.00 in U.S. Currency*, 931 F.2d
17 at 553.[13]

---

Regardless, because the court finds that there are still a sufficient number of undisputed material facts in support of probable cause, these facts do not help Mr. Salazar at this point in the proceedings. They may help him at trial when the legal standard is different, but that remains to be seen.

[13] Mr. Salazar also notes that "the other supporting indicia to cases which the amount and packaging of the currency have figured prominently in the probable cause analysis" are lacking in this case. Salazar's Motion for Summary Judgment, ECF No. 15 at 14-15. In support, he cites several Ninth Circuit opinions where a claimant not only carried a large amount of currency, but also, for example, used fake identification, lied about the amount of currency in his or her possession. *See United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001); *United States v. $49,576, in U.S. Currency*, 116 F.3d 425, 427-28 (9th Cir. 1997); *United States v. $215,300 U.S. Currency*, 882 F.2d 417, 420 (9th Cir. 1989). But these cases do not help Mr. Salazar much because the test for probable cause is based upon a "totality of the circumstances" of each case, and the presence of absence of any one particular fact is not dispositive. *See United States v. Approximately $1.67 Million (US) in Cash, etc.*, 513 F.3d 991, 999 (9th Cir. 2008); *Currency, U.S.*

1    Second, Mr. Salazar argues that the undisputed fact that the $127,000 was rubber-banded into
2 numerous bundles is not indicative of drug trafficking. Cases appear to go both ways when a large
3 amount of cash is merely rubber-banded into bundles, rather than, for example, wrapped in
4 cellophane. *See United States v. $242,484.00 in U.S. Currency*, 389 F.3d 1149, 1161-62 (11th Cir.
5 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large
6 quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't,
7 because there are better, safer means of transporting cash if one is not trying to hide it from the
8 authorities."); *U.S. Currency, $30,060*, 39 F.3d at 1042 ("The government contends that drug dealers
9 carry their money in wrapped bundles and that $30,060 is consistent with the cost of two kilograms
10 of cocaine. It provides, however, no authority for these contentions, which are, in any case,
11 speculative."); *cf. $42,500.00*, 283 F.3d at 982 ("[C]ellophane, which is largely impermeable to gas,
12 is commonly used to conceal the smell of drugs and avoid detection by drug dogs."). Still, because
13 "[b]undles of cash in various denominations wrapped in rubber bands has been found to be
14 "indicative of a drug organization bundling money," *United States v. Approx. $77,000 in U.S.*
15 *Currency*, No. 1:11-cv-01251 GSA, 2012 WL 1196498, at * 10 (E.D. Cal. Apr. 10, 2012) (citing
16 *$242,484.00 in U.S. Currency*, 389 F.3d at 1161-62), the court finds, when combined with the other
17 undisputed facts in this case, that the rubber-banding and bundling of the $127,000 to support the
18 Government's probable cause to believe the seized money to be related to drug trafficking.
19    Third, Mr. Salazar argues that his statements to TFA O'Malley and TFA Mahon were not
20 "suspicious." While it is true that Mr. Salazar contests the Government's characterization of many
21 of his statements to the agents (such as whether he was able to logically and fully explain why he
22 purportedly purchased used oil drill bits with cash, rather than through other, more conventional
23 means, why he did not receive receipts for these purchases, or whether he could not explain how he
24 obtained $77,000 of the $127,000 he was carrying), it is undisputed that Mr. Salazar gave the agents
25 some conflicting and incomplete information. For example, he told the agents that he was self-

---

28 *$42,500*, 283 F.3d at 980. As the cases cited above make clear, a large amount of cash may be "strong evidence" of a relationship to drug trafficking.

employed, but he also said that he worked for Rojo Supply Company, and he also stated that he was traveling to San Luis Obispo, California to purchase used oil drill bits from oil companies, but he did not provide the agents with any contact information for the suppliers of these drill bits. Complaint, ECF No. 1 at 3-4, ¶¶ 13-14. Although this information is hardly dispositive, when viewed in the totality of the circumstances, it does—albeit minimally—support a finding of probable cause. *See $22,474.00 in U.S. Currency*, 246 F.3d at 1217 (taking note of claimant's inconsistent statements and inability to answer questions about, e.g., his last job and the address of the person he claimed to be visiting; indicating that these facts "tended to support an inference that the money was drug-related"); *$191,910*, 16 F.3d at 1072 (discrepancies in story may be factors to consider in determining probable cause).

Fourth, Mr. Salazar argues that Dugan's positive alert to the seized currency does not mean much. He argues that the alert does not support probable cause because: (1) while it is unclear whether Dugan is a "sophisticated" narcotics detention canine, even if he is, the positive alert would suggest only a connection to cocaine (and the Government's theory, Mr. Salazar says, is that he is a marijuana trafficker), and (2) the positive alert is the only fact connecting the $127,000 to drug trafficking. Salazar's Motion for Summary Judgment, ECF No. 15 at 22-25.

The court is not persuaded by Mr. Salazar's arguments. For one, the court does not believe that the Government has put forth a theory that Mr. Salazar is a marijuana trafficker only. Its complaint alleges that the seized currency was furnished or intended to be furnished by a person in exchange for a controlled substance, was traceable to such an exchange, or was used or intended to be used to facilitate a violation of federal drug laws. Complaint, ECF No. 1 at 1, ¶ 1. And while the Government does allege that Mr. Salazar attended a hemp festival and that San Francisco is a source city for the purchase of marijuana and other illegal controlled substances, *id*. at 2, 6, ¶¶ 10, 20, nothing in the complaint limits the Government's theory to marijuana.

In addition, the Ninth Circuit cases relating to the probative value of positive dog alerts do not foreclose the use of a positive dog alert – whether by a "sophisticated" one or not – from supporting probable cause under the totality of the circumstances. In their briefs, the parties spend much time discussing how the Ninth Circuit's (and other Circuits') opinions regarding the amount of probative

value of such positive alerts have evolved as scientific studies regarding them have evolved. *See*, *e.g.*, Government's Opposition and Cross-Motion for Summary Judgment, ECF No. 34 at 23-25 (explaining that, prior to 1994, Ninth Circuit decisions often held that positive alerts were "strong evidence" of a link between the alerting currency and illegal drugs, that from 1994 to 2001, the Ninth Circuit's decisions diminished the evidentiary value of positive alerts, and then since 2001, the Ninth Circuit's decisions generally find positive alerts by "sophisticated" narcotics detection canines are once again "probative evidence" of a link between the alerting currency and drug trafficking); *see $42,500*, 283 F.3d at 982 (noting that a positive alert by a "sophisticated" narcotics detection canine is "an important factor in determining probable cause") (citing *$22,474*, 246 F.3d at 1216). But the fact is that Dugan, a narcotics detection canine trained to detect heroin, cocaine, marijuana, hashish, and methamphetamine, positively alerted to the seized currency. The cases cited by the parties stand for the point that Dugan's "sophistication" bears upon the weight to be given to his positive alert, but they do not state that his positive alert is meaningless or does not factor into the court's probable cause determination at all. And in the context of other facts supporting probable cause, as there are here, the court believes that Dugan's positive alert does too.[14]

The court also is not persuaded by the Mr. Salazar's other argument. Although it is correct in theory, *U.S. Currency, $30,060.00*, 39 F.3d at 1041 ("Where there is only a dog alert but no other credible evidence connecting the money or property to drugs, we have not hesitated to reverse a finding of probable cause."), it fails here because, as explained above, the Dugan's positive alert is not the only fact connecting the $127,000 to drug trafficking: the large amount, bundling, and his inability to answer clearly questions about how he acquired the money and what he planned to do with it also support a connection to drug trafficking.

In sum, the court finds that several uncontested facts—the extremely large amount of cash, the bundling of it with rubber-bands, the conflicting and incomplete information he gave to the agents, and Dugan's positive alert—support a finding of probable cause that the seized $127,000 was related

---

[14] The Government also cites to a case within this district where the court found, based on TFA Mahon's testimony, that Dugan is a "sophisticated" narcotics detection canine. *See United States v. $49,790 in U.S. Currency*, 763 F. Supp. 2d 1160, 1167 (N.D. Cal. 2010) (Walker, C.J.,).

to an illegal drug transaction. The Government had more than a "more than mere suspicion" when it instituted this action. *See $493,850.00 in U.S. Currency*, 518 F.3d at 1169.

### V. CONCLUSION

Based on the foregoing, Mr. Salazar's motion for summary judgment is **DENIED** and the Government's cross-motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Dated: July 17, 2012

_____
LAUREL BEELER
United States Magistrate Judge